IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DRY CREEK LANDFILL, INC., an Oregon corporation, ) ) ) | |
| ) | CV-04-3029-ST |
| Plaintiff, ) | |
| ) | FINDINGS OF FACT AND |
| v. ) | CONCLUSIONS OF LAW |
| ) | |
| WASTE SOLUTIONS GROUP, INC., a California ) corporation, ) | |
| ) | |
| Defendant. ) | |

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Dry Creek Landfill, Inc. ("Dry Creek"), filed this action in April 2004 to obtain a declaratory judgment involving the interpretation of its contract with defendant Waste Solutions Group, Inc. ("WSG"). In 1998 WSG entered into a 15 year contract to handle waste transfer services for municipalities in Humboldt County, California ("1998 HWMA

1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Agreement"). Also in 1998, WSG entered into a contract with Dry Creek for WSG to dispose of HWMA's truck hauled waste at the Dry Creek Landfill in Medford, Oregon ("Disposal Contract"). The Disposal Contract terminated in the event of termination of the 1998 HWMA Agreement for any reason. After the 1998 HWMA Agreement was "replaced and superseded" by a later contract that authorized WSG to use an alternate landfill for truck hauled waste, Dry Creek sought a declaratory judgment that the Disposal Contract has been terminated.

In March 2005, the parties filed cross-motions for summary judgment on Dry Creek's claim for declaratory relief (dockets # 20 & # 33). In its Findings and Recommendation dated July 28, 2005 ("F&R"), this court recommended granting partial summary judgment to WSG against Dry Creek's claim that the Disposal Contract had been terminated (docket # 70). District Judge Ancer L. Haggerty adopted the F&R on November 14, 2005 (docket # 80).

Also in March 2005, Dry Creek filed a motion to add three new claims (docket # 27). That motion was granted on July 28, 2005, as to two claims for declaratory relief to terminate the Disposal Contract based on WSG's alleged breach of a duty of good faith and fair dealing and for breach of contract based on a decrease in the volume of waste delivered to the Dry Creek Landfill by WSG (docket # 69).

On November 22, 2005, the 1998 HWMA Agreement was terminated by the HWMA and WSG. As a result, Disposal Contract also terminated, except for existing and ongoing obligations of Dry Creek and WSG.

According to the Pretrial Order, the only remaining claim in this case alleges a breach of contract by WSG based on its failure to pay Dry Creek for services provided under the Disposal Contract prior to its termination. WSG denies liability based on the affirmative defenses of estoppel, waiver, recoupment and set-off. Both parties claim the right to recover attorney fees.

2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

The parties agreed to trial to the court and consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

## FINDINGS OF FACT

### I. Parties

Dry Creek is a corporation incorporated under the laws of the State of Oregon with its principal place of business in the State of Oregon. Dry Creek owns and operates a fully-permitted and compliant solid waste landfill in Medford, Oregon.

WSG is a corporation incorporated under the laws of the State of California with its principal place of business in the State of California. WSG is generally engaged in the business of waste transfer, by rail transport and/or truck, and the logistical coordination of the transport and disposal of solid waste.

### II. Disposal Contract Terms

Pursuant to Section 4.1 of the Disposal Contract, WSG was required to pay Dry Creek a disposal fee based upon the tonnage of waste delivered by WSG to the Dry Creek Landfill. Section 4.1 further provides that, beginning on May 1, 2000, and on each May 1 thereafter, the "Disposal Service Price" to be paid by WSG to Dry Creek "shall be increased or decreased by a percentage equal to 75% of the percentage change within the previous calendar year in the Consumer Price Index utilized in the HWMA Agreement." Exhibit 1. Section 13.1(c) of the 1998 HWMA Agreement utilizes the U.S. City Average – All Urban Consumer's Index, CPI-U (all Urban Consumers: 1982-84 = 100) for the month of March, compiled and published by the United States Department of Labor, Bureau of Labor Statistics.

According to Section 7.9 of the Disposal Contract, the law of California applies to the parties' claims.

3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Section 7.11 of the Disposal Contract, the prevailing party is entitled to an award of its reasonable attorney fees and any other fees and costs incurred in connection with this action.

### III.     CPI Adjustment to WSG's Disposal Fee

For three years effective on May 1 of 2000, 2001, and 2002, Dry Creek increased the disposal fee to WSG pursuant to the CPI adjustment as required by Section 4.1 of the Disposal Contract. These increases were evidenced by both correspondence and notices signed by both parties. Exhibits 3, 5, 7, 9, & 10.

However, in May 2003, Dry Creek learned that WSG also was using the Anderson Landfill in California as an alternate site for truck hauled waste which it believed constituted a breach of the Disposal Contract by reducing the volume of waste delivered to the Dry Creek Landfill. On advice of counsel and to avoid any contention by WSG that Dry Creek had waived its claim, or was estopped from asserting, that the parties were no longer contractually bound, Dry Creek did not continue to assess and bill WSG from May 2003 through November 2005 for the escalated amounts to which Dry Creek was entitled under the Disposal Contract.

Dry Creek did not notify WSG why, and WSG did not inquire why, the invoices no longer included a CPI adjustment after May 2003. However, based on discussions with Don Cordell, President of Dry Creek, before May 2003 about various incentives Dry Creek could provide to WSG to retain the waste stream despite the Anderson Landfill, David Gavrich, WSG's President, assumed that Dry Creek stopped charging the CPI adjustment in order to reduce WSG's costs. After May 2003, WSG continued to send a portion of its waste stream to Dry Creek.

4 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

## IV. CPI Adjustment to Dry Creek's "Transportation Management Services"

In connection with the disposal fees that were paid by WSG to Dry Creek under the Contract, Dry Creek paid LB RailCo, Inc., a "transportation management service" fee each month from the disposal fees received from WSG. Dry Creek had no written contract with LB RailCo, Inc. However, it proposed to WSG during negotiations for the Disposal Contract that WSG pay a "tip fee" and that Dry Creek pay a "freight allowance" to an affiliate of WSG. The "freight allowance" is the same as the "transportation management service" fee. WSG apparently accepted this proposal since Dry Creek paid a "transportation management service" fee through November 2005. This arrangement resulted in a lower net disposal fee to WSG that Dry Creek could keep confidential from the host community.

According to this informal agreement, the "transportation management service" fee was to be adjusted annually based upon the same CPI adjustment that was applied to WSG's disposal fees due under the Disposal Contract. Effective May 1, 2000, LB Railco, Inc., increased the "transportation management service" fee to Dry Creek pursuant to the same CPI adjustment applicable to the Disposal Contract. Exhibit 4. In about April 2001, the rights of LB RailCo, Inc., to the "transportation management service" fee from Dry Creek were assumed by G&G Logistics, Inc. ("G&G"), a corporation organized under the laws of California. G&G is a separate legal entity and is not a party to this litigation, although the documents reflect it is has the same address and same Chief Financial Officer as WSG. Effective May 1, 2001, G&G increased the "transportation management service" fee to Dry Creek by the same CPI adjustment applicable to the Disposal Contract. Exhibits 8 & 9.

5 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

G&G did not charge any CPI adjustment to Dry Creek effective May 1, 2003. However, by letter dated September 30, 2004, G&G notified Dry Creek of the CPI adjustment which should have been effective May 1, 2004, and included the CPI adjustment in its invoice for the month of October 2004. Exhibits 12 & 24. While still paying the amount of the "transportation management service" fees invoiced, Dry Creek did not pay any additional amounts based upon any CPI adjustments charged after October 2004. In response to an inquiry dated February 8, 2005, about the short payments for the months of October, November and December 2004, Dry Creek's attorney advised WSG's attorney that Dry Creek would not make the requested payment to G&G unless WSG provided "written assurances that payment requested will not otherwise be construed or argued by either [G&G] or [WSG] as a wavier of any rights" asserted by Dry Creek in the pending litigation. Exhibit 13.

On the invoice for February 2005, G&G added the notice that "[a] late fee of 1.5 % per month past due can be imposed." Exhibit 24. G&G had no agreement with Dry Creek that authorized imposition of any late fee. However, starting with the invoice for May 2005, G&G unilaterally assessed a 1.5% per month "late fee" upon all CPI adjusted "transportation management service" fees that Dry Creek was not paying.

## V.  Litigation

On April 23, 2004, Dry Creek filed this lawsuit for declaratory relief. On July 30, 2004, the HWMA gave written notice to WSG of its desire to terminate the 1998 HWMA Agreement. Exhibit 30, p. 1. A key reason for that notice was the cloud of Dry Creek's lawsuit against WSG. The HWMA and WSG then engaged in negotiations to resolve their dispute over the

6 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

terms and circumstances under which the HWMA could achieve a buyout of the 1998 HWMA Agreement. *Id*.

On February 3, 2005, Dry Creek put WSG on notice that it was in breach of the Disposal Agreement "by virtue of WSG's delivery of waste to the Anderson Landfill." Exhibit 32, p. 1. This notice was given to comply with Section 6.2 of the Disposal Contract requiring written notice of a breach and an opportunity to cure the alleged breach. Having received no response to the notice or any cure of the breach, Dry Creek notified WSG by letter dated March 7, 2005, that it considered the Disposal Agreement "to additionally be terminated, to the extent that termination has not already occurred, effective March 17, 2005." *Id*. That letter also advised WSG that it would amend its Complaint to allege this breach, but, in the meantime, would "continue to otherwise honor the terms and provisions of the Disposal Agreement pending the court's resolution of the parties' conflicting claims." *Id* at 2.

At a mediation on May 11, 2005, the HWMA and WSG tentatively resolved their dispute, "subject to the preparation of a formal and definitive settlement agreement between the parties." Exhibit 30. Under that tentative agreement, the HWMA agreed to purchase all of WSG's assets for $6.9 million.

On July 28, 2005, this court issued its F&R that the Disposal Contract had not been terminated by WSG's 2000 and 2003 contracts with the HWMA. On August 8, 2005, Dry Creek's attorney provided to WSG's attorney a spreadsheet reflecting Dry Creek's CPI calculation, showing a total due of $64,307.74 had the CPI adjustments been made. Exhibit 14. In an earlier telephone conversation, Dry Creek's attorney explained to WSG's attorney that Dry Creek had been reluctant "to apply and bill WSG for the CPI adjustment because it did not

7 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

wish to acknowledge the continued viability of the contract." Exhibit 15. In a letter dated August 15, 2005, enclosing another copy of the calculation, Dry Creek's attorney advised WSG's attorney that he expected that the F&R would not be adopted, but "since the parties continue to operate under the [Disposal Contract] in the interim, there is no reason why Dry Creek should not be paid the amount due from WSG." *Id*. He also advised that unless WSG paid $74,307.74 to Dry Creek within 30 days, WSG would again have breached the Disposal Contract and Dry Creek would amend its Complaint to add that claim. *Id*. WSG made no response and failed to make the payment requested.

On September 26, 2005, the Board of Directors of the HWMA approved the final settlement agreement with WSG and authorized its Chair to sign it, which he did on September 29, 2005. Exhibits 30 & 31. In that agreement, the parties acknowledged that WSG was being sued by Dry Creek, and WSG made no representations regarding its Disposal Contract with Dry Creek. Exhibit 30, pp. 1 & 3. The closing date was set to occur within three months. *Id* at 2.

By letter dated November 17, 2005, Dry Creek's attorney provided WSG's attorney a copy of a proposed Second Amended Complaint which added a claim for breach of contract based on WSG's failure to pay the full amount owed for disposal services provided by Dry Creek. Exhibit 16.

The 1998 HWMA Agreement was terminated on November 22, 2005. Accordingly, the Disposal Contract also terminated, except for existing and ongoing obligations of Dry Creek and WSG as provided for in the Disposal Contract. The last delivery of waste by WSG to Dry Creek under the Disposal Contract took place on November 22, 2005.

On January 3, 2006, Dry Creek's attorney sent a spreadsheet to WSG's attorney showing a disposal fee due of $86,330.58 for May 1, 2003, through November 22, 2005. Exhibit 17. By letter dated February 3, 2006, WSG requested a "final and correct invoice" from Dry Creek for disposal services for the partial month of November 2005. Exhibit 18. On March 14, 2006, Dry Creek's attorney provided that final invoice for November 2005 in the sum of $46,805.76, adding that "this invoice does not reflect the total amount owed by WSG to Dry Creek since it does not include the CPI adjustment to which Dry Creek was entitled from and after 2002" in the additional sum of $86,330.58, for a total due of $133,136.34.[1] Exhibit 19.

On April 11, 2006, WSG tendered the sum of $4,244.31 to Dry Creek for the net amount due on the November 2005 invoice "less the amount due and owing [G&G] . . . . in the amount of $42,561.45." Exhibit 20. That amount consists of $14,151.86 for the November 2005 "transportation management service" fee (including the 2004 CPI adjustment) plus $28,409.59 for the short payments from October 2004 through October 2005 and the 1.5% late charge on those short payments. By letter dated April 18, 2006, Dry Creek rejected that tender because the Disposal Contract does not authorize such an offset. Exhibit 21.

## CONCLUSIONS OF LAW

This Court has diversity jurisdiction over Dry Creek's claim pursuant to 28 USC § 1332 because: (1) Dry Creek is incorporated under the laws of the State of Oregon; (2) WSG is incorporated under the laws of the State of California; and (3) the value of the matter in controversy exceeds $75,000, exclusive of interest and costs.

The Disposal Contract requires an annual increase or decrease in the disposal fee paid by WSG. WSG does not dispute that if it were obligated to pay the CPI adjustment, that the amount

---

[1] According to the recalculation in Exhibit 28, the correct amount due as of October 15, 2006, is $132,052.90.

9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

due through October 15, 2006, is $132,052.90, consisting of the November 2005 disposal fee of $46,805.76 and the CPI adjustment from May 2003 through November 2005 of $86,247.14.

To avoid this obligation, WSG contends that Dry Creek voluntarily relinquished its right to increase the disposal fee by not requesting payment after May 2003. And even if Dry Creek may now recover what it deferred collecting to buttress its litigation position, WSG contends that its right to recover attorney fees for prevailing on the declaratory judgment claim creates a set-off in excess of Dry Creek's claim.

**I.**     <u>**Waiver**</u>

According to California law, "'[w]aiver is the intentional relinquishment of a known right after knowledge of the facts. The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver.'" *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal 4th 1, 31, 44 Cal Rptr 2d 370, 387, 900 P2d 619, 636 (1995) (citation omitted). "The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." *Id* (citations omitted). Waiver rests "solely on the intent of the waiving party." *Id* (citations omitted).

WSG's waiver defense fails for two reasons. First, Section 7.14 of the Disposal Contract expressly states that "[n]o term or condition of this Agreement shall be deemed waived, unless such waiver shall be reduced to writing and be signed by the party to be charged therewith." No such waiver was ever reduced to writing and signed by Dry Creek.

Second, Dry Creek did not intend to waive its right to charge the CPI adjustment. As explained in the notice of August 15, 2005, Dry Creek deferred billing WSG for the CPI adjustment fees because of its concern that it would be construed as a waiver. Because Dry

10 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Creek did not "intentionally" relinquish its right to bill WSG for the CPI adjustment, WSG's defense of waiver fails.

## II.    Estoppel

Estoppel requires proof of four elements: "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his injury." *Ashou v. Liberty Mut. Fire Ins. Co.*, 138 Cal App 4th 748, 766-67, 41 Cal Rptr 3d 819, 831-32 (2006) (citations omitted).

WSG argues that Dry Creek is estopped to demand payment of the disposal fees by its conduct of issuing invoices since May 2003 without the CPI adjustments. Although the Disposal Contract does not expressly bar an estoppel defense, WSG's argument fails for lack of proof.

First, WSG has not met its burden of proof that Dry Creek intended to issue invoices without the CPI adjustments to be relied upon by WSG to its detriment, or acted in such a way that WSG had a right to believe Dry Creek so intended. After concluding that WSG was in breach of the Disposal Contract in May 2003, Dry Creek consulted with counsel and decided not to charge the CPI adjustment, but instead to continue to operate under the Disposal Contract prior to the breach in order not to adversely impact its contention that the Disposal Contract was terminated. Had Dry Creek not accepted WSG's waste or charged more than the contract price after the alleged breach, then Dry Creek could be sued for damages for nonperformance. Therefore, Dry Creek honored the old contract price and asserted declaratory judgment claims. Dry Creek could have easily avoided an estoppel defense by so advising WSG of its intent at that time. Unfortunately, it did not. The issue is whether that failure is fatal to Dry Creek's claim.

11 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

As WSG correctly notes, Dry Creek did not file suit until April 2004 and initially alleged that the Disposal Contract had been terminated due to the new agreements between WSG and the HWMA. WSG also points to the fact that Dry Creek made no demand or claim to recover the CPI adjustment until August 2005 after the adverse F&R was issued. Nevertheless, those facts do not prove that Dry Creek intended for WSG to do anything that would cause it injury.

Dry Creek sought termination of the Disposal Contract because WSG's 2003 amended agreement with the HWMA added the Anderson Landfill as an alternate site for truck hauled waste. The resulting reduction in waste formed the grounds for Dry Creek's declaratory judgment action. If the Disposal Contract had been terminated by that act, as Dry Creek alleged, then Dry Creek was not entitled to recover any CPI adjustment. Only after the court decided that the Disposal Contract had not been terminated was Dry Creek in a position to require WSG to pay the CPI adjustment. A breach of contract claim for failure to pay the CPI adjustment ripened only after WSG failed to comply with a demand to pay. In other words, Dry Creek's conduct has always been consistent with its litigation position.

Furthermore, all WSG did in response to Dry Creek's invoices without the CPI adjustment was to continue to deliver waste to the Dry Creek Landfill, although at a reduced volume, which Dry Creek accepted. Dry Creek did express concern to WSG before May 2003 about the impact of the addition of the Anderson Landfill, and WSG's decision to send waste to Dry Creek instead of to the Anderson Landfill was price sensitive. However, the record is devoid of any evidence that WSG sent waste to the Dry Creek Landfill, rather than to the Anderson Landfill, after May 2003 because Dry Creek did not charge the CPI increase. In fact, the invoices reveal that the volume of waste delivered to Dry Creek fluctuated, dropping by at

12 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

least one-third before May 2003 and even more in late 2003, slightly increasing by March 2004 and dropping again in late 2004. No explanation is provided for those fluctuations. If Dry Creek had intended the lack of a CPI increase to induce WSG to deliver more waste at a higher cost than charged by the Anderson Landfill, it was not particularly effective.

Because the lack of a CPI adjustment reduced its costs, WSG had no economic incentive to question Dry Creek about it. Not charging a CPI increase was one of the options discussed by WSG with Dry Creek prior to May 2003 as an inducement for WSG to continue delivering waste despite the Anderson Landfill, but the parties never reached an agreement. WSG's "don't ask, don't tell" response does not entitle WSG to assume, without confirming, that had the Disposal Contract been terminated as Dry Creek believed, then Dry Creek's failure to bill the CPI adjustment was intended solely to induce WSG to deliver more waste, rather than to act consistently with its litigation position that the Disposal Contract was terminated.

Second, WSG has failed to meet its burden of proof of detrimental reliance. As previously noted, there is no evidence that WSG could and would have diverted all waste to the Anderson Landfill after May 2003 had Dry Creek charged the CPI adjustment. The only other possible detrimental reliance by WSG is relying on Dry Creek's invoices to determine the amount of its liability when settling its dispute with the HWMA. Under that settlement agreement, WSG had to pay for all disposal services rendered up to the closing date. However, the settlement with the HWMA was not final until late September and did not close until November 2005 after Dry Creek's counsel sent WSG's counsel the CPI adjustment calculation in August 2005, explaining why it had not been billed earlier and demanding payment. Since WSG

was on notice of Dry Creek's claim before it completed the settlement with the HWMA and did nothing, it cannot claim any detrimental reliance based on that settlement.

WSG relies on *Calistoga Nat'l Bank v. Calistoga Vineyard Co., Ltd.*, 7 Cal App 2d 65, 46 P2d 246 (1935), to argue that its detrimental reliance on Dry Creek's billings with a CPI adjustment presents a classic example of estoppel. *Calistoga* is readily distinguishable from this case. In that case, the defendants seeking estoppel were induced not to sue to recover the amount of forged checks within the statute of limitations by repeated fraudulent promises by the plaintiff to take the forged checks into consideration as a credit on their note when it was paid. Here, in contrast, Dry Creek made no repeated fraudulent promises.

WSG also asserts that Dry Creek's acceptance of payments from WSG shown to be due on its monthly billings creates an account stated, citing *TXU Energy Retail Co. LP v. Agri-Cel, Inc.*, 2006 WL 2385256 (ND Cal Aug. 16, 2006), and *Levy v. Prinzmetal*, 134 Cal App 2d Supp 919, 286 P2d 1023 (1955). However, "a stated account is held to be, as a rule, *prima facie* evidence only of the accuracy and correctness of the charges stated therein." *Vaughan v. City of Tulare,* 56 Cal App 261, 268, 205 P 21 (1922). "An account stated need not cover all the dealings or claims between the parties. There may be a partial settlement and account stated as to some of the transactions." *Gleason v. Kramer,* 103 Cal App 3d 782, 790, 163 Cal Rptr 483 (1980). The issue here is whether WSG knew, despite the monthly billings without a CPI adjustment, that Dry Creek might assert a right to recover the CPI adjustment later if the Disposal Contract was not terminated. WSG knew that the Disposal Contract entitled Dry Creek to the CPI adjustment and by August 2005, at the latest, was put on notice of Dry Creek's claim to the CPI adjustment. Thus, an account stated theory is inapplicable.

14 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

WSG has not proved that Dry Creek intended its actions to lull WSG into a false sense of security regarding the CPI adjustments, or that WSG relied to its detriment upon such a belief. Accordingly, the affirmative defense of estoppel fails.

### III.     Set-Off and Recoupment

The common law and equitable doctrines of setoff and recoupment are embodied, in part, in various California statutes. *Birman v. Loeb*, 64 Cal App 4th 502, 518–21, 75 Cal Rptr 2d 294, 305–07 (2d Dist 1998). The most applicable is California Code of Civil Procedure § 431.70 providing in part:

> Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the person's claim would at the time of filing the answer be barred by the statute of limitations . . . .

*Also see Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal App 3d 1089, 1095, 283 Cal Rptr 53, 55 (1991) (Section 431.70 "provides that cross-demands for money between two persons may be set off against each other and considered paid to the extent they balance in amount").

Here WSG argues that it is entitled to an award of attorney fees for prevailing on Dry Creek's initial declaratory judgment claim which will exceed the amount of Dry Creek's claim, thus barring Dry Creek's claim by recoupment or setoff. However, this court has not yet made a determination as to who is the prevailing party or if there is more than one prevailing party. As provided by California Civil Code § 1717(b):

> The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract . . . the party prevailing on the contract shall be the party who recovered the greater relief in the action on the contract.

15 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

In determining whether a party has prevailed, the trial court "compare[s] the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources." *Hsu v. Abbara*, 9 Cal 4th 863, 876, 39 Cal Rptr 2d 824, 891 P2d 804 (1995). "When the results of litigation are 'mixed' the trial court may determine that no party has prevailed on the contract." *Id*. "If neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevails on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees." *Scott v. Blount, Inc.*, 20 Cal 4th 1103, 1109, 86 Cal Rptr 2d 614, 979 P2d 974 (1999).

Even if this court determines that WSG was the prevailing party in this case on the basis of the earlier summary judgment ruling, given the other claims asserted and the relief awarded, the amount of attorney fees is something that can only be determined after WSG submits an appropriate motion for that award and the court has ruled on any objections raised by Dry Creek. Because there is no award of attorney fees as yet, nothing may be recouped or set-off against Dry Creek's claim.

Furthermore, absent an award of attorney fees, WSG's claim for fees did not coexist with Dry Creek's claim at, or prior to, the time of filing. WSG does not claim attorney fees because Dry Creek defaulted under the Dispoal Contract. Instead, they arise, if at all, as a prevailing party award which is a claim separate and apart from any claim related to performance of the Disposal Contract. Because WSG's claim for attorney fees has not yet been matured and fees would be unrelated to the claims arising from the Disposal Contract, WSG fails to meet the requirements of setoff and recoupment based on its potential recovery of attorney fees.

16 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Another possible source of setoff or recoupment arises from Dry Creek's debt to G&G. Dry Creek disputes how much it owes for the "transportation management services" fee to G&G. Although Dry Creek agreed to pay G&G an annual CPI adjustment on the "transportation management service" fee, it disputes that it owes any late fee or interest. It also disputes the right of WSG to deduct that fee from amounts it owes to Dry Creek.

Although WSG argues that it has paid the obligation due and owing from Dry Creek to G&G, it offered no evidence that it had done so.[2] Instead, it only offered the April 11, 2006 letter from its counsel enclosing a check payable to Dry Creek in payment of the net amount due to Dry Creek "less the amount due and owing G&G." Exhibit 20. The letter does not state that WSG paid G&G. Furthermore, the evidence does not reveal that WSG has acquired all of G&G's assets or an assignment of this particular debt. Absent that evidence, this court must treat G&G as a non-party to this dispute. Accordingly, any money that Dry Creek owes to G&G is not before this court, and, at least in the context of this case, cannot be offset or recouped against any judgment owed by WSG to Dry Creek.

## IV.    Conclusion

In sum, Dry Creek has met its burden of proving that WSG breached the Contract by failing and refusing to pay the CPI adjusted disposal fees owed by WSG to Dry Creek. WSG has failed to satisfy its burden of proof with respect to its affirmative defenses of waiver, estoppel, set-off or recoupment, none of which serve to reduce or eliminate Dry Creek's claim for beach of contract.

---

[2] WSG also argued that G&G is dissolved, but offered no evidence of that fact.

17 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Therefore, WSG owes Dry Creek the principal sum of $132,052.90 through October 15, 2006. Under the law of California, prejudgment interest is calculated at the rate of 10% per annum. Interest accrues from August 15, 2005, the date that demand was made by Dry Creek upon WSG for disposal fees that had accrued to that point. Dry Creek is entitled to an award of interest at the rate of 10% per annum upon all payments of principal owed as of August 15, 2005, together with payments that became due thereafter from the date that they became due until said sums are paid in full. Interest through October 15, 2006, totals $9,887.35 and accrues at the rate of $12.82 per day on the sum of $46,805.76 until paid and at the rate of $23.63 per day on the sum of $86,247.14 until paid.

This court has not yet determined who is the prevailing party in this case or if there is more than one prevailing party. It also reserves for later determination the issue of whether attorney fees should be awarded to either party.

Dry Creek shall prepare and submit to both WSG and the court a proposed final form of judgment incorporating the rulings on all claims and defenses, except for attorney fees and costs.

DATED this 27th day of October, 2006.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge